J-S03030-23

2023 PA Super 112

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WALTER FAISON | : | |
| | : | |
| Appellant | : | No. 909 EDA 2022 |

Appeal from the Judgment of Sentence Entered February 11, 2022
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0004017-2019

BEFORE: BOWES, J., McCAFFERY, J., and SULLIVAN, J.

OPINION BY McCAFFERY, J.: **FILED JUNE 20, 2023**

Walter Faison (Appellant) appeals from the judgment of sentence imposed in the Delaware County Court of Common Pleas, following his jury conviction of attempted rape, stalking,[1] and related charges for the assault of his ex-girlfriend, T.C. (Victim). On appeal, Appellant challenges: (1) the trial court's denial of his Pa.R.Crim.P. 600 motion to dismiss; (2) the court's admission of a multitude of prior bad acts evidence concerning Appellant's past abuse of Victim; (3) the sufficiency of the evidence supporting his conviction of attempted rape; (4) the discretionary aspects and legality of his sentence; and (5) the constitutionality of his sexual offender registration requirements. For the reasons below, we affirm.

_____

[1] 18 Pa.C.S. §§ 901(a)/3121 & 2709.1(a)(1).

## I.  FACTS & PROCEDURAL HISTORY

As we recount in more detail below, Appellant was arrested on March 14, 2019, after Darby Borough police interrupted him attempting to sexually assault Victim, his ex-girlfriend, in the lobby of her apartment building.  He was charged with attempted rape, attempted sexual assault, indecent assault (two counts), terroristic threats, stalking, resisting arrest, and institutional vandalism.[2]

On October 14, 2020, Appellant filed a motion to admit evidence relating to Victim's prior sexual conduct with Appellant pursuant to Pennsylvania's Rape Shield Law.[3]  *See* Appellant's Motion to Admit Evidence Relating to 18 Pa.C.S. § 3104, 10/14/20, at 1-3 (unpaginated).  The court granted Appellant's motion following a hearing.  *See* Order, 1/12/21.  Relevant herein, both parties filed several additional motions before trial.  On August 26, 2021, Appellant filed an omnibus motion seeking to dismiss the charges based upon a purported defective preliminary hearing and a violation of his speedy trial rights pursuant to Pa.R.Crim.P. 600.  *See* Appellant's Omnibus Motion to Quash/Petition for Writ of Habeas Corpus, 8/26/21, at 1-10.  Alternatively, he

---

[2] *See* 18 Pa.C.S. §§ 901(a)/3124.1, 3126(a)(1) and (a)(3), 2706(a)(1), 5104, and 3307(a)(3), respectively.

[3] *See* 18 Pa.C.S. § 3104 (evidence of a victim's past sexual conduct, though generally inadmissible, is permitted when the past sexual conduct is with the defendant and consent of the alleged victim is at issue).

sought pretrial release on nominal bail.[4]  **See id.** at 8-9.  On September 15, 2021, the Commonwealth filed a motion in *limine* seeking to admit evidence of Appellant's prior bad acts, specifically:  (1) in July 2017 and February 2018, Appellant threatened Victim leading to two separate charges of terroristic threats; (2) in March of 2018, Victim reported to police that Appellant was stalking her; (3) the next day, Victim obtained a temporary Protection from Abuse (PFA) order against Appellant; (4) in September 2018, Appellant pled guilty to both terroristic threats charges; (5) on February 25, 2019, upon his release from prison, Appellant was instructed by his probation officer to have no contact with Victim; (6) on February 26th, Victim reported to police that Appellant was harassing and stalking her; (7) on February 27th, Victim reported to Appellant's probation officer that he was stalking and threatening her; and (8) on February 28th, Appellant's probation officer issued a bench warrant for his arrest.  **See** Commonwealth's Motion in Limine for Admission of Other Acts, 9/15/21, at 4-5.[5]

_____

[4] In May of 2021, while he was represented by counsel, Appellant filed a *pro se* motion seeking release on nominal bail pursuant to Pa.R.Crim.P. 600(B)(1).

[5] The Commonwealth also sought to present evidence that Appellant pled guilty to charges of indecent assault, simple assault and possession of an instrument of crime in October of 2002 "for his abusive behavior toward a [different] woman[.]"  Commonwealth's Motion in Limine for Admission of Other Acts at 5.  However, the Commonwealth later withdrew its request to present evidence concerning the prior victim.  **See** N.T., 9/20/21, at 65.

The trial court considered both pretrial motions during a two-day hearing conducted on September 20 and 25, 2021. On September 24, 2021,[6] the court entered two orders which, *inter alia*: (1) granted, in part, the Commonwealth's motion, and permitted it to "introduce evidence concerning prior acts of [Appellant] directed toward the alleged victim . . . in [the] instant matter;" and (2) denied Appellant's Pa.R.Crim P. 600 motions for dismissal of the charges or release on nominal bail. **See** Orders, 9/24/21.

The matter proceeded to a jury trial commencing on September 29, 2021, where the following evidence was presented. On March 14, 2019, at approximately 5:13 p.m., the Delaware County Emergency Communications received a 911 call from an unidentified female who asked them to "send somebody" to "1102 Main Street in Darby, and hung up the phone." **See** N.T., 9/29/21, at 60, 63; N.T., 9/30/21, at 115-16. The reason for the call was unknown. **See** N.T., 9/29/21, at 60-61. Darby Borough Police Officers Joseph Yocum and Dante Lynch responded to the call within three to five minutes. **Id**. at 61; **see also** N.T., 9/30/21, at 106-08. Officer Yocum approached the apartment building first as Officer Lynch parked their vehicle. **See** N.T., 9/29/21, at 66. Prior to knocking on the door, Officer Yocum "peeked through the [partially glass] door . . . to see what was going on." **Id.** at 67. He described what he observed as follows:

---

[6] The record is unclear why the court entered its dispositive orders on September 24th **before** the scheduled supplementary hearing on September 25th.

- 4 -

. . . I saw [V]ictim . . . up against the wall with both hands on the wall. I observed her pants to be pulled down, along with her panties, exposing her full butt. At that time, [Appellant] was on his knees with . . . both of his hands wrapped around . . . her thigh area, and . . . his face was level in height with her buttocks but a little bit away, maybe a foot away, looking at her butt.

* * *

[V]ictim was almost pinned against the wall. If she wanted to move[,] she couldn't. Her hair was in disarray. Her eyes were crying and as she moved her hands around I could see that they were visibly shaking. She was scared. I could tell she was scared.

*Id.* at 67-68. Officer Yocum also saw a "small child, maybe five years old[,]" sitting on a stairwell, crying. *Id.* at 68. When the officer approached the door, Appellant stated he was "just fucking with [his] girlfriend[.]" *Id.* at 73-74.

Officer Yocum ordered Appellant to open the door and proceed outside; Appellant complied. *See* N.T., 9/29/21, at 73-74. The officer explained that Victim then grabbed his arm and told him they "needed to speak upstairs" so she could get away from Appellant. *Id.* at 74. Officer Yocum described Victim as crying and "gasping for air . . . as she was talking." *Id.* She relayed that Appellant was not her boyfriend "and that he was attempting to sexually assault her and that this was not the first time that this had happened." *Id.* at 74-75.

Meanwhile, Officer Lynch spoke with Appellant outside on the porch. N.T., 9/30/21, at 109. Appellant told the officer that he and Victim "were trying to work things out" and that he was "just trying to get some pussy." *Id.* After Officer Yocum finished speaking with Victim, he proceeded outside

- 5 -

to place Appellant under arrest. *See id.* at 111. Although Appellant was initially compliant, he soon turned combative and told the officers, "[Y]ou're going to have to shoot me. You're going to have to kill me." *Id.* Officers Yocum and Lynch requested backup, and it took approximately five officers to place Appellant in custody. *See id.* at 111-12. "Once he was arrested, [Appellant] became combative at the police station and flooded the holding cell by deliberatively clogging the toilet with pieces of acoustic paneling he broke from the cell wall." Trial Ct. Op., 6/7/22, at 2.

Victim testified at trial and recounted her three-year, tumultuous relationship with Appellant. They met on Facebook in 2016, and had been involved in an on-again, off-again, relationship since that time. *See* N.T., 9/29/21, at 116. Victim testified that Appellant physically and sexually assaulted her on June 29, 2017, following an argument. *See id.* at 158-61. Victim admitted that, during that argument, she stabbed Appellant with scissors in an attempt to get him off of her. *See id.* at 160. Victim stated she reported the incident to police, but they never did "anything after that incident[.]"[7] *Id.* at 161-62.

Victim also recounted the two incidents that resulted in the filing of terroristic threats charges against Appellant. On July 29, 2017, Victim reported to police that Appellant threatened to kill her — specifically, he stated

---

[7] The Commonwealth presented photographs Victim had taken to document her injuries and her panties, which Appellant had ripped off during the assault. *See* N.T., 9/29/21, at 164-68.

he was "going to shoot [her], and he's going to stab [her] 37 times."  N.T., 9/29/21, at 174, 178.  She filed a second police report on February 17, 2018, stating that Appellant threatened to kill both her and her friend, after she blocked his phone calls.  *Id.* at 182-83.  On March 12, 2018, Victim also obtained a temporary protection from abuse order against him, which was later dismissed.  *See id.* at 185-88.

The Commonwealth presented evidence that, in 2018, Appellant entered a guilty plea to terroristic threats at each docket and was imprisoned for approximately nine and one-half months.  *See* N.T., 9/29/21, at 219; N.T., 9/30/21, at 182.  After his release, Appellant had an appointment with his probation officer on February 25, 2019 — 17 days before the incident in question — and was specifically directed to have no contact with Victim.  *See* N.T., 10/1/21, at 8-9.  However, only two days later, Victim called Appellant's probation officer to report that Appellant was "stalking her[,]" "calling nonstop[,]" and threatening her life.  *Id.* at 9, 15.

Victim testified that during this time, she and Appellant were not in a relationship, and she had blocked him from calling her.  *See* N.T., 9/29/21, at 118-19.  However, in the weeks prior to the attempted rape, he called and messaged her repeatedly.  *Id.* at 119-20.  Specifically, Victim recounted that in the early morning hours of March 14, 2019, Appellant began calling and texting her from different numbers, telling her "he just want[s] to fuck" her.  *Id.* at 121-22. Although she blocked him and told him no "[m]ultiple times[,]" Appellant was undeterred, and told her, if she would not come to him "he was

coming to [her]." *Id.* at 122. He also told her "[h]e's not scared to get locked up because he's going to get out." *Id.*

Just prior to her 911 call, Victim arrived at her apartment with her then five-year-old autistic son. *See* N.T., 9/29/19, at 114, 123-24. She purposely parked behind the building so that Appellant would not see her car. *Id.* at 124. As she and her son walked to the residence, she noticed Appellant coming towards her. *Id.* Appellant was angry and told her that he walked a long distance to her home. *See id.* at 124-25. He asked Victim if she could talk to him and told her he "wanted to fuck" her. *Id.* at 125. While Appellant was distracted for a few minutes with her son, Victim dialed 911. *Id.* at 126-27. Appellant allowed Victim to take her son up to her second-floor apartment while he waited downstairs. *Id.* at 127.

When Victim came back down, Appellant "grabbed" her and tried to kiss her. N.T., 9/29/21, at 128. She testified that she "pushed him away a couple of times" but he then "got on his knees and stared to unbutton [her] pants." *Id.* Victim stated she tried to keep her pants up while he held her against the wall and tried to pull them down. *Id.* Victim was crying and telling Appellant to stop. *Id.* Appellant pulled down her pants and underwear and "put his face by [her] butt[,]" telling her he "wanted to fuck" her and "eat [her] pussy." *Id.* at 130-31. Sometime during the assault, her son came down the steps. Victim testified she felt "[h]opeless" and "[s]cared." *Id.* at 131. At that point, Officer Yocum arrived and interrupted the assault. *See id.* at 129.

In addition to the aforementioned testimony and evidence, the Commonwealth read into the record numerous text message exchanges between Appellant and Victim from both before and after the assault at issue. Appellant did not testify in his own defense. However, he did present one witness to contradict Victim's account of the alleged June 2017 prior assault.

On October 1, 2021, the jury returned a verdict of guilty on all charges, with the exception of terroristic threats, of which the jury found him not guilty. Appellant proceeded to sentencing on February 11, 2022. At the beginning of the hearing, the trial court noted that Appellant refused to participate in both the presentence investigation report and a psychological evaluation. *See* N.T., 2/11/22, at 3. Further, Appellant waived his right to an assessment pursuant to the Sexual Offenders Registration and Notification Act (SORNA).[8] *Id.* at 9. The Commonwealth noted that Appellant was subject to two mandatory minimum sentences — (1) a term of 10 years' imprisonment pursuant to 42 Pa.C.S. § 9714(a)(1) because he had previously been convicted of a crime of violence;[9] and (2) a term of 25 years' imprisonment pursuant to 42 Pa.C.S. § 9718.2(a)(1) since he had a prior conviction for a sexual offense.[10] *See* N.T., 2/11/22, at 16-19.

_____

[8] 42 Pa.C.S. §§ 9799.11-9799.42.

[9] *See* N.T., 2/11/22, at 18 (prior conviction of a "felony-one robbery offense").

[10] *See* N.T., 2/11/22, at 16 (prior conviction of indecent assault).

At the conclusion of the hearing, the trial court imposed the following sentence: (1) a mandatory minimum sentence of 25 to 50 years' imprisonment for attempted rape, followed by three years' consecutive probation;[11] (2) a concurrent mandatory minimum sentence of 25 to 50 years for one count of indecent assault; (3) a consecutive term of 40 to 84 months for stalking; and (4) two concurrent terms of 12 to 24 months for institutional vandalism and resisting arrest.[12] The trial court found the second count of indecent assault merged with the first, and the charge of attempted sexual assault merged with attempted rape. Thus, the aggregate sentence imposed was 340 to 684 months' imprisonment (28 years, 4 months to 57 years). The court also directed Appellant to register as a Tier III sexual offender for his lifetime pursuant to Subchapter H of SORNA. *See* 42 Pa.C.S. §§ 9799.11(c) (Subchapter H applies to individuals who committed sexually violent offense on or after December 20, 2012); 9799.14(d)(2), (14) (attempted rape is a Tier III sexual offense); 9799.15(a)(3) (Tier III sexual offender registers for life).

---

[11] *See* 42 Pa.C.S. § 9716 ("Where two or more sections requiring mandatory minimums sentences are applicable, the court shall be bound by that sections requiring the greater penalty."); 42 Pa.C.S. § 9718.5(a) ("A person who is convicted in a court of this Commonwealth of an offense under section 9799.14(d) (relating to sexual offenses and tier system) shall be sentenced to a mandatory period of probation of three years consecutive to and in addition to any other lawful sentence issued by the court.").

[12] The sentences for institutional vandalism and resisting arrest were imposed concurrent with each other, and with the sentence for stalking, but consecutive to the attempted rape sentence. *See* N.T., 2/11/22, at 65.

Appellant filed a timely post-sentence motion on February 22, 2022,[13] challenging the legality and discretionary aspects of his sentence, the constitutionality of SORNA's Subchapter H, and the weight of the evidence supporting his convictions. *See* Appellant's Post-Sentence Motion, 2/22/22, at 1-5 (unpaginated). The trial court denied the post-sentence motion on February 25, 2022, and this timely appeal follows.[14]

## II. ISSUES ON APPEAL

Appellant presents the following seven issues for our review:

1) Whether the trial court erred and abused its discretion in denying [A]ppellant's motion to dismiss pursuant to Pa.R.C[rim.].P. 600(A)?

2) Whether the trial court erred and abused its discretion in admitting "the whole history of abuse" pursuant to Pa.R.E. 404(b) where the overwhelming and pervasive nature of the evidence introduced was inadmissible under Pa.R.E. 403 and Pa.R.E. 404(b)?

3) Whether the evidence was insufficient to establish [A]ppellant's guilt for the offense of attempted rape beyond a reasonable doubt, in violation of [A]ppellant's state and federal constitutional rights?

---

[13] The 10th day following imposition of sentence, Monday, February 21, 2022, was a legal holiday. *See* Pa.R.Crim.P. 720(A)(1) (post-sentence motion must be filed no later than 10 days after sentencing); 1 Pa.C.S. § 1908 (when the last day of statutory time period fall on a legal holiday, that day is omitted from computation).

[14] After being granted an extension of time, Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

4) Whether the sentence for third-degree felony stalking is an illegal sentence because the evidence did not establish the requirements for a third-degree felony offense?

5) Whether the sentence of [25 to 50 years] of incarceration imposed for indecent assault constitutes an illegal sentence as that sentence should have merged with the sentence for attempted rape?

6) Whether the trial court erred as a matter of law and violated the discretionary aspect of sentencing when it imposed a manifestly excessive and unreasonable sentence of [28 years, 4 months to 57 years] of incarceration plus 3 years of probation?

7) Whether [A]ppellant's sex offender registration pursuant to Subchapter H of Act 29 is unconstitutional and his registration should be stayed pending resolution of *Commonwealth v. Torsilieri*, 97 MAP 2022?

Appellant's Brief at 5-6.[15]

### III.  **RULE 600**

In his first claim, Appellant argues the trial court erred and abused its discretion when it denied his motion to dismiss the charges based upon a violation of his constitutional right to a speedy trial codified in Pennsylvania Rule of Criminal Procedure 600.  Our review of a trial court's order denying a defendant's motion to dismiss on Rule 600 grounds is well-settled.

> In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration.  An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly

---

[15] We have reordered Appellant's claims for purposes of disposition.

unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

**So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime.** In considering [these] matters . . . courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Horne*, 89 A.3d 277, 283–84 (Pa. Super. 2014) (emphasis added & citation omitted).

Rule 600 requires that, in a case in which a written complaint is filed, trial must commence within 365 days of the date the complaint is filed. Pa.R.Crim.P. 600(A)(2)(a). If a defendant is not brought to trial within the required time, he "may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated." Pa.R.Crim.P. 600(D)(1). The trial court must then conduct a hearing on the motion. *Id.* Subsection (C) further provides that when computing time for

- 13 -

Rule 600 purposes, "periods of delay at any stage of the proceeding caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of time within which trial must commence[, but a]ny other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1). Therefore, a Rule 600 analysis entails the following three steps:

> First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any, to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600([D]). As we have explained, Rule 600[] encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date. Addition of any Rule 600[] extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.

***Commonwealth v. Carl***, 276 A.3d 743, 749 (Pa. Super. 2022) (citation omitted), *appeal denied*, 337 MAL 2022 (Pa. Feb. 15, 2023).

In the present case, Appellant's criminal complaint was filed on March 14, 2019; thus, his mechanical Rule 600 run date was March 14, 2020. Appellant agrees that there were three periods of excludable time due to defense requests for continuances: May 8, 2019 – June 5, 2019 (28 days), June 5, 2019 – July 3, 2019 (28 days), and October 7, 2019 – November 18, 2019 (42 days). **See** Appellant's Brief at 31. Therefore, the addition of these

98 days of excludable time resulted in an adjusted run date of June 20, 2020.

*See id.*

In determining Appellant's Rule 600 rights were not violated, the trial court included another 35-day period as excludable time. It noted that Appellant requested, and was granted, a continuance from November 18, 2019, until December 23, 2019. *See* Trial Ct. Op. at 7. Thus, the court determined there were 133 days of excludable time. *Id.* Further, the trial court found there was "significant excusable delay attributable to the COVID-19 pandemic." *Id.* The court opined:

> On March 16, 2020, and March 18, 2020, the Pennsylvania Supreme Court, Nos. 531 and 532 Judicial Administration Docket, declared a judicial emergency in the courts of the Commonwealth due to the COVID-19 viral infection pandemic, closed the courts to the general public, stopped all jury trials in the Commonwealth and delegated certain authority to the President Judges of the Judicial Districts.
>
> On May 27, 2020, the Supreme Court, Nos. 531 and 532 Judicial Administration Docket, delegated emergency authority to the President Judges of the Judicial Districts to issue Administrative Orders in connection with the judicial emergency in their Judicial Districts and the measures to be implemented by Administrative Order in those districts.
>
> President Judge Kevin F. Kelly has entered a series of Administrative Orders pursuant to this delegation of emergency authority which remained in effect until July 19, 2021. As a result, all of the time from March 16, 2020[,] through July 19, 2021[,] is excusable delay for purposes of the Rule 600 time calculation. This period of time amounts to 490 days of excusable delay.
>
> This court concludes as a matter of law that the judicial emergency declared by the Pennsylvania Supreme Court and the President Judge of the 32nd Judicial District (Delaware County Common Pleas Court) through the administrative emergency authority delegated to him specifically by the Pennsylvania

- 15 -

Supreme Court is a delay in the bringing of this case to trial **not caused by a failure of the Commonwealth to exercise due diligence.** *See*, Pa.R.J.A. No. 1952(A) and (B). Since the delays were not attributable to the Commonwealth, these periods of time are excluded from the Rule 600 time calculation. *See* Pa.R.Crim.P. 600(A)(2)(a).

The total elapsed time from the date of Appellant's arrest through the commencement of trial was [928[16]] days. However, after considering the [133] days of exclude[a]ble time and the [490] days of excusable delay, the trial commenced [305] days after arrest. As a result, the Motion for Dismissal pursuant to Pa.R.Crim.P. 600 was properly denied.

*Id.* at 8-9 (emphasis added & footnotes omitted).

Appellant's argument is two-fold. First, he insists the trial court "erroneously concluded that the time from November 18, 2019 through December 23, 2019 constituted a defense request for a continuance and was therefore excludable time." Appellant's Brief at 31. Second, he maintains that "the excludable time pertaining to the COVID pandemic is inapplicable because [he] had a valid Rule 600 motion **before** the pandemic time began running." *Id.* (emphasis added). We conclude no relief is warranted.

Regarding the first time period, Appellant maintains the November 18th continuance was not a defense request. *See* Appellant's Brief at 32. However, the Commonwealth indicated to the court its notes for that listing stated "defense counsel requested a status date in order to consider the Commonwealth's offer[, and] provid[e] counter offers[.]" *See* N.T., 9/20/21,

_____

[16] The trial court found 929 days elapsed between the filing of the criminal complaint and the commencement of the jury trial. *See* Trial Ct. Op. at 9. The one-day difference is inconsequential to our determination.

at 16. The court's records confirmed the Commonwealth's averment: "Under November 18, 2019[,] I have trial status date — defendant's counter proposal." **See id.** at 17. Nevertheless, even if we do not consider this 35-day delay as excludable time charged to Appellant, we conclude the suspension of jury trials in Delaware County resulting from the COVID pandemic extended Appellant's Rule 600 run date well past the date trial commenced.

There is no dispute that the Pennsylvania Supreme Court declared a general statewide judicial emergency due to the COVID-19 pandemic on March 16, 2020, which was subsequently extended until June 1, 2020, and during this period, the Court explicitly suspended time calculations pursuant to Pa.R.Crim.P. 600(C). **See In re General Statewide Judicial Emergency**, 228 A.3d 1283 (Pa. Mar. 18, 2020); **In re General Statewide Judicial Emergency**, 230 A.3d 1015 (Pa. Apr. 28. 2020). When the statewide judicial emergency ended on June 1, 2020, the Supreme Court provided that any local emergencies would remain in effect and empowered the local President Judges to extend the judicial emergency based upon the specific public health concerns in their own districts. **See In re General Statewide Judicial Emergency**, 234 A.3d 408 (Pa. May 27, 2020). Appellant does not dispute the fact that the President Judge of Delaware County extended the judicial emergency several times and **suspended jury trials until July 19, 2021**. **See** Sixth Emergency Order Extension — Criminal Section, 7/2/21. Both the Commonwealth and the trial court insist that this period of time — from March

16, 2020, until July 19, 2021 — is excludable from the time calculations of Rule 600. We agree.

During the Rule 600 hearing, the trial court explicitly asked the prosecutor if they would have agreed to proceed *via* a bench trial in this matter during the period when jury trials were suspended. *See* N.T., 9/20/21, at 13. The prosecutor replied: "I would have agreed to a non jury trial in this case. It was [Appellant's] right to a jury trial." *Id.* Appellant did not contest the Commonwealth's response, but simply noted that he had a constitutional right to both a jury trial and a speedy trial. *See id.* Neither at the hearing, nor on appeal, did Appellant ever assert he was willing to waive his right to a jury trial. It certainly would not serve the dual purpose of Rule 600 if a defendant could demand a jury trial (as is their constitutional right) during a time when it is impossible for the Commonwealth to conduct a jury trial, and determine that the resulting delay was not excusable under the Rule.

Here, however, Appellant insists that the continuance of trial granted on February 25, 2020 — the final trial date **before** the commencement of the judicial emergency — was requested by the Commonwealth. *See* Appellant's Brief at 33. In support of this claim, he attached to his brief a purported email sent from the Commonwealth to the trial court's law clerk on February 18, 2020, stating that one of its witnesses was unavailable for the trial date and the Commonwealth "will need to request a continuance." Appellant's Brief, Exhibit F. Because this continuance extended the trial date to August 18, 2020 — beyond the adjusted run date of June 20, 2020 — Appellant argues the

Commonwealth did not exercise due diligence in bringing him to trial within the Rule 600 run date. *See* Appellant's Brief at 33. Thus, he concludes the time period attributable to the pandemic is irrelevant. *Id.*

Appellant's claim fails for two reasons. First, at the Rule 600 hearing, the trial court determined that it rescheduled the February 25, 2020, trial because the court, itself, was "not available the week of February 25, 2020[,] due to . . . other business being conducted in the courtroom." N.T., 9/25/21, at 49. *See also id.* at 36. Second, while Appellant now relies upon a purported email, which he claims demonstrates the Commonwealth failed to act with due diligence, he did not proffer this email before the trial court. We emphasize:

> [T]his Court has regularly stated that copying material and attaching it to a brief does not make it a part of the certified record. It is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in the case. That is because for purposes of appellate review, what is not of record does not exist.

*Commonwealth v. Johnson*, 33 A.3d 122, 126 n.6 (Pa. Super. 2011) (citations omitted). Thus, any argument based on an email which was **not** presented to the trial court is waived for our review.

Further, to the extent Appellant claims he could have filed a Rule 600 motion prior to the judicial emergency, we reiterate that Appellant concedes there were 98 days of excludable time due to defense continuances, which resulted in an adjusted run date of June 20, 2020. Thus, whether or not the Commonwealth was prepared to go to trial when the case was continued in

February of 2020 is immaterial. The adjusted run time had not expired. Thus, if we add the 490 days during which jury trials were suspended — a delay the trial court determined was "not caused by a failure of the Commonwealth to exercise due diligence"[17] — the adjusted run date would have been October 23, 2020, nearly a month after the date Appellant's jury trial commenced. Accordingly, we conclude no relief is warranted on Appellant's Rule 600 claim.

## IV.    PRIOR BAD ACTS

Next, Appellant argues the trial court abused its discretion when it permitted the Commonwealth to admit substantial, cumulative evidence of Appellant and Victim's abusive relationship as prior bad acts evidence pursuant to Pa.R.E. 404(b). *See* Appellant's Brief at 34. While Appellant concedes some of the evidence may have been admissible, he maintains that the "overabundance and pervasiveness of prior acts evidence tainted the trial in such a way as to render the admission of all of the evidence not harmless error and inadmissible under Pa.R.E. 403 and 404(b)." *Id.* at 34-35.

> Our review of an evidentiary challenge is well-established:
>
> [The a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

---

[17] *See* Trial Ct. Op. at 9.

*Commonwealth v. Dula*, 262 A.3d 609, 626 (Pa. Super. 2021) (citation omitted), *appeal denied*, 273 A.3d 985 (Pa. 2022).

Pursuant to the Pennsylvania Rules of Evidence, "[a]ll relevant evidence is admissible[.]" Pa.R.E. 402. Evidence is deemed relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). Regardless of relevancy, however, evidence of a defendant's prior bad acts "is not admissible to prove [the defendant's] character in order to show that on a particular occasion the [defendant] acted in accordance with the character." Pa.R.E. 404(b)(1). However, such evidence may be admissible when offered for another purpose, such as to prove the defendant's intent. **See** Pa.R.E. 404(b)(2). Nevertheless, "[i]n a criminal case, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." **Id.** Furthermore:

> [T]he prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b)(3).

As noted above, Appellant concedes that some of the evidence concerning his prior history with Victim may have been admissible. **See** Appellant's Brief at 34. However, he argues the trial court abused its discretion when it permitted the Commonwealth to introduce a multitude of

cumulative prior bad acts evidence — some of which was not raised by the Commonwealth either in its motion in *limine* or during the pretrial hearings. *See id.* at 36-37. Notably, he claims the Commonwealth did not address "the prior June 2017 rape nor the voluminous text messages surrounding each prior act that was introduced." *Id.* at 37; *see also id.* at 40 (Appellant claiming "he was not on notice . . . that the Commonwealth intended to introduce photographs of injuries and underwear in relation to" the prior rape allegation).

Appellant also maintains the Commonwealth improperly "told the jury about all of the instances of prior conduct in its opening statement[,]" when the trial court had ruled that the evidence would be admissible only after "a foundation was laid." Appellant's Brief at 37. He claims: "After these opening remarks which flew in the face of the trial court's order, there was no hope for [him] to get a fair trial" since "[t]he proverbial cat was out of the bag without allowing the trial court to conduct any analysis of whether the prior allegation of sexual assault — or any other acts — were admissible under either Pa.R.E. 404(b) or Rule 403."[18] *Id.* at 38. Appellant emphasizes that while the trial court preliminarily ruled the prior bad acts evidence was admissible if a proper foundation was laid, "the Commonwealth never gave the court a change to

---

[18] Pa.R.E. 403 permits the trial court to "exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

make this determination . . . despite [his] repeated objections[.]" *Id.* at 41. Moreover, Appellant insists "the Commonwealth did not need all of the prior act evidence" to prove its case. *See id.* at 39. Lastly, he contends that the trial court's error in admitting this evidence was not harmless — rather, "the abundance of prior acts evidence played a central role in bolstering the Commonwealth's case." *Id.* at 42.

Preliminarily, we note that to the extent Appellant contends the Commonwealth improperly addressed his prior bad acts in its opening statement to the jury, he waived that claim when he failed to object to the Commonwealth's opening argument at trial. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Sanchez*, 82 A.3d 943, 969–70 (Pa. 2013) ("[T]o preserve for appellate review an objection relating to the opening or closing address of opposing counsel, the objection must be specific and brought to the trial judge's attention as soon as is practical.").

Appellant also complains that the Commonwealth failed to provide notice of the Victim's allegation that Appellant raped her in June of 2017, and her accompanying photographic evidence, prior to trial. *See* Appellant's Brief at 40. Again, however, we conclude he waived this objection. When the Commonwealth asked Victim about "previous sexual abuse" at trial, Appellant objected only as to relevance. *See* N.T., 9/29/21, at 156-58. He maintained that the Commonwealth's only purpose in presenting this evidence was to demonstrate his bad character — he did not object on the basis of lack of

notice. ***See id.*** at 158. Later, when the Commonwealth introduced photographs Victim took of her ripped underwear and injuries resulting from that incident, Appellant objected on the basis that he had just received the evidence the week **before** trial. ***See id.*** at 162. The court noted, however, Appellant was aware of the evidence, and concluded it was relevant. ***See id.*** at 162-63. Thus, Appellant's claim concerning lack of notice also fails.[19]

In rejecting Appellant's challenge to the admission of the prior bad acts evidence, the trial court opined:

> Specifically, the admitted bad-acts evidence was centered on three prior incidents between Appellant and [V]ictim. On June 29, 2017, there was an incident when [Victim] reported to police that Appellant had physically assaulted her and forcibly engaged in nonconsensual sex with her. No charges were filed. The relationship ended for a while but later resumed. Thereafter, there were a series of problems between Appellant and [Victim]. On March 12, 2018, [Victim] obtained a temporary [PFA] order against Appellant. The temporary order was dismissed after [Victim] failed to appear for a hearing to consider entry of a final order. In July of 2017, Appellant was charged with making terroristic threats to [Victim]. In February of 2018, Appellant was again charged with making terroristic threats to [Victim].

_____

[19] Although the June 2017 incident was not specifically identified in the Commonwealth's motion in *limine*, the Commonwealth alluded to the fact that Appellant had been sexually abusive in the past. **See** Commonwealth's Motion in Limine for Admission of Other Acts at 4. Moreover, when discussing the prior bad acts evidence at the pretrial hearing, the Commonwealth stated it intended to introduce evidence regarding Appellant's prior convictions for terroristic threats, "[a]nd whatever was provided evidence-wise to defense counsel[,]" noting that Victim "has provided facts regarding a consistent pattern of abuse, stalking as well as **sexual abuse** by" Appellant. **See** N.T., 9/20/21, at 65-66 (emphasis added). At the time, Appellant's counsel made a general objection that he did not "have that evidence[,]" but never repeated the objection at trial.

Appellant ultimately entered guilty pleas to each of these charges and spent time in jail.

\* \* \*

Evidence of these other bad acts was introduced, not to demonstrate that Appellant had a propensity for committing crime, but for acceptable purposes. The June 29, 2017[,] incident was highly probative on the issue of specific intent in proving the charges of attempted rape and attempted sexual assault. The trial testimony established that[, in the present case,] Appellant had gone to [V]ictim's home, forced her to face a wall, and removed her pants. Police interrupted Appellant during the commission of the crime and before there was sexual penetration. **The intent of Appellant at that point in time was the exact issue in dispute at trial.** The prior non-consensual sex forced upon [V]ictim two years earlier suggested Appellant's intent. Evidence of this earlier assault helped to establish that Appellant had the specific intent to rape [V]ictim in the present case. It established specific intent, not by showing bad character, but by demonstrating that when Appellant acted similarly in the past, it led to forced, non-consensual sex. Thus, it tended to demonstrate Appellant's state of mind at the time the current crime was committed. This is a permissible use of other-acts evidence.

The prior convictions for terroristic threats and the temporary [PFA] order tend to prove that [V]ictim was fearful of Appellant, and that he acted with the intent to terrorize her (an element of terroristic threats). This evidence also tended to establish the element of stalking — namely, that Appellant engaged in a course of conduct. The evidence of other bad acts by Appellant was limited to behavior of Appellant in relation to the same victim . . . over the course of their two-year relationship.

Further, Appellant and [Victim] had a relationship that lasted more than two years. It was not a conventional relationship in that there were periods which involved bitter fights and assaults followed by periods which involved making-up and expressions of love by both Appellant and [Victim]. In fact, the evidence at trial demonstrated Appellant and [Victim] spoke frequently by telephone while Appellant awaited trial on this case. Appellant and [V]ictim continued to express their love for one another in these telephone calls despite the pending charges. The other acts evidence admitted pursuant to Pa.R.E. 404(b)(2) gave the jury necessary insight into their tumultuous relationship and provided

appropriate context. The probative value of the other-acts evidence was not outweighed by the risk of unfair prejudice or confusion of the jury. Appellant was aware of the other acts evidence before trial and the other acts all dealt with his pattern of abuse targeted at the same victim. The other-acts evidence was a part of the sequence of events that led to the case at issue[.]

In addition, the court gave [two] limiting instruction[s]. [*See* N.T., 9/30/21, at 183-84; N.T., 10/1/21, at 257-58]. The jury was cautioned to consider the other-acts evidence only as potential evidence of intent but not as character evidence or propensity evidence. As a result, the admission of other-acts evidence was proper.

Trial Ct. Op. at 10-14 (emphasis added).

Upon our review, we detect no abuse of discretion on the part of the trial court. Evidence regarding the alleged prior sexual assault, as well as the history of the parties' tumultuous relationship, was clearly relevant to establish Appellant's intent at the time his assault of Victim was interrupted by Officer Yocum. Indeed, after the officer caught Appellant red-handed, his only available defenses were (1) that he never intended to rape Victim; (2) that he did not take a substantial step towards raping her; or (3) that she consented to his actions. The fact that he had sexually assaulted her less than two years earlier was relevant to establish his intent on the day in question. Moreover, in the context of the parties' abusive relationship, the testimony was relevant to rebut any allegation that Victim consented to Appellant's actions. **See** N.T., 9/29/21 at 45 (opening argument for Appellant; counsel arguing that parties discussed marriage and Victim "put[ ] money" in Appellant's prison account "so that he could call her[, but] that [was] not the bill of goods [the Commonwealth] sold when [the jury] heard that rape").

We also emphasize the trial court provided two cautionary instructions to the jury. *See* N.T., 9/30/21, at 183-84 (instructing the jury that it should consider Appellant's prior convictions of terroristic threats "for the specific limited purpose of proof . . . of [Appellant's] intent on the date, and at the time, in question in this incident"); N.T., 10/1/21, at 257-58 (instructing the jury that it should consider the evidence of the "prior alleged conduct of [Appellant] directed at [Victim] only for the specific limited purpose of proof . . . of [Appellant's] intent on the date and at the time in question in this criminal case[;]" cautioning jury it could not consider the evidence "for any other purpose" including as evidence showing Appellant "is a person of bad character or criminal tendencies"). The Supreme Court has observed that "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014). Moreover, "[i]t is well settled that the jury is presumed to follow the trial court's instructions[.]" *Commonwealth v. Cash*, 137 A.3d 1262, 1280 (Pa. 2016).

We also conclude that Appellant's claim this evidence was unnecessary to prove the Commonwealth's case is specious.

> The Commonwealth was not required to omit portions of its case to accommodate [the defendant]. A jury is free to believe all, part or none of the evidence presented. For this reason, the Commonwealth can never be certain which, if any, of its evidence will be believed by the jury and regarded as proving a particular fact beyond a reasonable doubt. We will not hamper the Commonwealth's ability to present all of its relevant evidence to the jury to prove each and every element of the crimes charged.

- 27 -

*Commonwealth v. Claypool*, 495 A.2d 176, 180 (Pa. 1985).

Lastly, we address Appellant's challenge to the admission of text messages between Appellant and Victim. Preliminarily, we note that during Victim's direct examination, the Commonwealth introduced a number of text messages between Appellant and Victim from February 26, 2019, through the day of the assault, March 14, 2019. *See* N.T., 9/29/21, at 132, 144-45, 153-54; *see also* Commonwealth's Exhibits C4, C5, C6. The Commonwealth did not have Victim read all of the messages, but rather highlighted the fact that Appellant persistently contacted her after she asked him to leave her alone. *See*, *e.g.*, N.T., 9/29/21, at 142, 144, 151, 155-56. This evidence was relevant and admissible to prove the charged crime of stalking. *See* 18 Pa.C.S. 2709.1(a)(1) ("A person commits the crime of stalking when the person . . . engages in a court of conduct or repeatedly commits acts toward another person . . . under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person[.]"). The Commonwealth also introduced into evidence text messages between Appellant and Victim from June 29 through July 2, 2017, following the prior alleged sexual assault. *See* N.T., 9/29/21, 170-72. Appellant objected on the basis that he had not seen the texts prior to trial, but following a brief recess, realized he had. *See id.* Again, the Commonwealth did not ask Victim to read the texts into evidence, but simply had her identify them. *See id.* at 169-70, 173.

However, during cross-examination, Appellant questioned Victim's account of the June 2017 incident, highlighting the fact that she stabbed him before the alleged rape. **See** N.T., 9/30/21, at 41-43, 52-53. Appellant also cross-examined Victim about certain text messages she sent in the weeks prior to the March 2019 incident, in which she did not appear to be scared of him, and, in fact, appeared to be taunting and threatening him. **See** N.T., 9/29/21, at 231-32, 235-38. Finally, Appellant introduced text messages from January 28, 2019, in which Victim sent intimate messages to Appellant. **See id.** at 241-44.

Therefore, upon redirect, the Commonwealth had Victim read all of her text messages with Appellant in the weeks prior to the attempted rape. **See** N.T., 9/30/21, at 64-85. When Appellant objected on the basis that the evidence was cumulative, the trial court overruled the objection concluding that introduction of the entire "document" was necessary to provide context to their conversations.[20] **See id.** at 80-82; **see also** Pa.R.E. 106 ("If a party introduces all or part of a writing . . . , an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time."). The Commonwealth also asked Victim to read into evidence the texts following the 2017 incident. **See id.** at 86-93. Appellant again objected to the evidence as cumulative, but the trial court

_____

[20] Moreover, we note that because the text messages were not read into evidence during Victim's direct testimony, the evidence was not cumulative.

found that the messages provided "a more complete picture" of the parties' "complex" relationship.  *See id.* at 88-89.

We detect no abuse of discretion on the part of the trial court.  Both the Commonwealth and Appellant utilized the parties' complicated relationship to their benefit.  The Commonwealth argued that the history of abuse explained why Victim kept reuniting with Appellant, even after he had been convicted of making terroristic threats to her.  Likewise, Appellant argued that Victim's expressions of love and intimacy after the alleged 2017 rape and his 2018 criminal convictions demonstrated that he had no intention of raping her on the day in question — and, accordingly, supported his defense at trial.  Thus, no relief is warranted.

## V.    **SUFFICIENCY OF EVIDENCE**

In his third issue, Appellant challenges the sufficiency of the evidence supporting his conviction of attempted rape.[21]   Specifically, he argues the Commonwealth failed to prove beyond a reasonable doubt that he had the specific intent to rape Victim, and that he took a substantial step towards that goal.  *See* Appellant's Brief at 45-47.  Rather, he emphasizes that although the officer observed him kneeling behind Victim's exposed buttocks, he was "fully clothed."  *Id.* at 46.  Appellant contends that the cases in which a

---

[21] Appellant does not challenge the sufficiency of the evidence supporting any of his other convictions.

- 30 -

conviction of attempted rape has been upheld, "all involved an action on the part of the defendant in attempting to remove his own clothes, or committing a sexual act where the only reasonable inference was that the defendant then intended to penetrate the [victim's] genitals with his penis." *Id.* at 47 (citing cases). Further, he insists testimony regarding the "prior rape" was "improperly admitted . . . and therefore cannot be relied upon to establish" his intent herein. *Id.* at 48.

We review a challenge to the sufficiency of the evidence pursuant to the following standard:

> [We consider] whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. **Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.** Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Helsel*, 53 A.3d 906, 917–18 (Pa. Super. 2012) (citation omitted & emphasis added).

A conviction of rape requires proof that, *inter alia*, the defendant engaged in sexual intercourse with the victim by "forcible compulsion." 18 Pa.C.S. § 3121(a)(1). "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). Thus, as Appellant asserts, "the Commonwealth was required to prove that [he] had the intent to commit rape and that he committed an act constituting a substantial step towards the commission[ ] of that crime." Appellant's Brief at 46.

We conclude the evidence presented by the Commonwealth was more than sufficient to support the jury's guilty verdict on the charge of attempted rape. As the trial court explains in its opinion, Appellant took a substantial step towards raping Victim "by pinning [her] against a wall and forcibly removing her pants." Trial Ct. Op. at 18 (record citation omitted). Officer Yocum testified that when he interrupted the assault, Victim was unable to move, "crying[,] visibly shaking[, and] scared." N.T., 9/29/21, at 68. Victim testified that in the weeks and hours leading up to the assault, as well as while he was unbuttoning her pants, Appellant repeatedly told her he wanted to "fuck" her. ***See id.*** at 120, 122, 125, 130. Moreover, Appellant himself admitted to Officer Lynch that he was "just trying to get some pussy." N.T., 9/30/21, at 109. These statements, coupled with the Victim's allegation that Appellant had sexually abused her on a prior occasion, were sufficient for the

jury to conclude Appellant **intended** to rape Victim on the date in question, and took a substantial step toward that goal before police arrived on scene.

Appellant insists, however, that there was "no evidence . . . of any substantial step towards penetration [because he] was fully clothed[,] kneeling behind" Victim when police arrived. Appellant's Brief at 47. The law does not require that the defendant be in a state of undress at the time a attempted rape is thwarted in order to prove the defendant **intended** to rape the victim. *See Commonwealth v. Martin*, 452 A.2d 1066, 1070 (Pa. Super. 1982) (evidence sufficient to support conviction of attempted rape when defendant grabbed and dragged victim involuntarily, threatened to kill her and expressed intention to have sex with her, before releasing her when she pretended to suffer an asthma attack); *Commonwealth v. Keeler*, 448 A.2d 1064, 1072 (Pa. Super. 1982) (evidence sufficient to support conviction of attempted rape when defendant grabbed victim from the street, threw a shirt over her head and told her he was going to rape her; victim was able to escape following a struggle); *Commonwealth v. Bullock*, 393 A.2d 921, 922-23 (Pa. Super. 1978) (evidence sufficient to support conviction of attempted rape when, after defendant abducted, robbed, and threatened to kill victim, he ripped off victim's shirt, pulled down her bra and attempted to remove her pants before he was thwarted by police). Accordingly, Appellant's sufficiency claim fails.

## VI. ILLEGAL SENTENCE FOR STALKING

Appellant next argues the sentence imposed on his conviction of stalking is illegal because the trial court improperly graded the offense as a third-degree felony, rather than a first-degree misdemeanor.[22]  ***See*** Appellant's Brief at 43.  When considering a challenge to the legality of a sentence, "we apply a *de novo* standard of review and plenary scope of review." ***Commonwealth v. Lake***, 281 A.3d 341, 348 (Pa. Super. 2022), *appeal denied*, 395 MAL 2022 (Pa. Jan. 18, 2023).

The offense of stalking is generally graded as a first-degree misdemeanor.  ***See*** 18 Pa.C.S. § 2709.1(c)(1).  However, the Crimes Code provides for a higher grading under the following circumstances:

> A second or subsequent offense under this section or a first offense under subsection (a) **if the person has been previously convicted of a crime of violence involving the same victim**, family or household member, **including, but not limited to**, a violation of section 2701 (relating to simple assault), 2702 (relating to aggravated assault), 2705 (relating to recklessly endangering another person), 2718 (relating to strangulation), 2901 (relating to kidnapping), 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), an order issued under section 4954 (relating to protective orders) or an order issued under 23 Pa.C.S. § 6108 (relating to relief) **shall constitute a felony of the third degree.**

---

[22] Appellant correctly observes that while he did not include this claim in his post-sentence motion, a challenge to the grading of an offense implicates the legality of sentence, and may be raised at any time.  ***See*** Appellant's Brief at 43 n.11, *citing* ***Commonwealth v. Ramsey***, 214 A.3d 274, 277 n.4 (Pa. Super. 2019); ***Commonwealth v. Mendozajr***, 71 A.3d 1023, 1027 (Pa. Super. 2013).

J-S03030-23

18 Pa.C.S. § 2709.1(c)(2) (emphases added).

Appellant emphasizes that the crime of terroristic threats is not listed as one of the "qualifying" violent offenses in the stalking statute. Appellant's Brief at 44. Moreover, he maintains that it is not "defined as a crime of violence in any other statute." *Id.*, *citing* 42 Pa.C.S. § 9714(g) (mandatory minimum sentences for second and subsequent crimes of violence); 61 Pa.C.S. § 4503 (listing crimes of violence which make defendant ineligible for Recidivism Risk Reduction Incentive Act). Thus, he insists "the prerequisites for a third-degree felony stalking conviction were not satisfied" and we must vacate his sentence and remand for resentencing as a first-degree misdemeanor.[23] Appellant's Brief at 45.

When interpreting the words of a statute, our goal is to "ascertain and effectuate the intention of the General Assembly." **Commonwealth v. Bortz**, 909 A.2d 1221, 1223 (Pa. 2006).

> The best evidence of legislative intent are the words used by the General Assembly. If the words are clear and free from all ambiguity, the letter of the law is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). Only when the Legislature uses words that are not explicit do we turn to other factors to ascertain its intent. 1 Pa.C.S. § 1921(c). Finally, we will strictly construe penal provisions in favor of the defendant and against the Commonwealth. 1 Pa.C.S. § 1928(b)(1).

---

[23] The trial court imposed a sentence of 40 to 84 months' imprisonment for Appellant's conviction of stalking. The maximum penalty for a first-degree misdemeanor is five years' (or 60 months') incarceration. **See** 18 Pa.C.S. § 1104(1).

- 35 -

*Id.*

Here, the stalking statute increases the grading of a stalking conviction when, *inter alia*, the defendant "has been previously convicted of a crime of violence involving the same victim[.]" 18 Pa.C.S. § 2709.1(c)(2). Furthermore, while the statute provides a list of offenses which constitute a prior "crime of violence," it specifically states that it is "not limited" to those offenses. *Id.*

Under the facts presented here, we agree with the trial court's determination that Appellant's prior convictions of terroristic threats committed against Victim qualify as prior "crimes of violence" under the stalking statute sufficient to increase the grade of the offense to a third-degree felony. *See* Trial Ct. Op. at 19. In both cases, Appellant explicitly threatened to murder Victim. *See* N.T., 9/29/21, at 178 (in July 2017, Appellant threatened to "shoot [Victim] and . . . stab [her] 37 times."); 182-83 (in February 2018, Appellant threatened to "kill" Victim and her best friend). Moreover, in both cases, he pled guilty to a charge of terroristic threats, and was "ordered to have no contact with" Victim. *See* N.T., 9/30/21, at 182.

The relevant provision of the statute provides that a person "commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S. § 2706(a)(1). While the crime is not specifically listed in Section 2709.1(c)(2), we conclude that Appellant's prior conviction for threatening to murder Victim qualifies as a crime of violence under the statute.

Indeed, while many of the enumerated crimes involve the infliction of physical harm, some of them — such as kidnapping or a violation of a protective order or PFA — do not. As the Commonwealth emphasizes in its brief, this Court has determined that a defendant violated a protective order by sending a non-threatening text message to his ex-wife. *See* Commonwealth's Brief at 28, *citing* **Commonwealth v. Taylor**, 137 A.3d 611 (Pa. Super. 2016) (*en banc*). If such a prior conviction could increase the grade of a subsequent stalking conviction, surely Appellant's two, prior convictions of threatening to kill Victim are sufficient to support the felony grading in the present case. Accordingly, we conclude the trial court imposed a legal sentence for Appellant's stalking conviction.

## VII. MERGER OF SENTENCES FOR ATTEMPTED RAPE AND INDECENT ASSAULT

Appellant's second sentencing issue concerns the trial court's refusal to merge his sentences for attempted rape and indecent assault. Appellant's Brief at 49. Although the court imposed these sentences to run concurrently, Appellant insists they should have merged for sentencing purposes because "the substantial step for the commission of rape and the indecent assault were predicated upon the same facts" — Appellant's "pulling [Victim's] pants down, holding her thighs and looking at her buttocks, by threat of forcible compulsion." *Id.* at 53.

A claim that two convictions should have merged for sentencing challenges the legality of sentencing; thus it presents "a question of law, and as such, our scope of review is plenary and our standard of review is *de novo.*" ***Commonwealth v. Lomax***, 8 A.3d 1264, 1267 (2010).

> Sentencing merger questions are governed by 42 Pa.C.S. § 9765:
>
> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. As our Supreme Court has explained,

> [t]he statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other.

***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009). Notably, "Section 9765 does not require an evaluation of the specific facts as applied to the elements[; rather,] our analysis begins and ends with the statutory elements of each offense." ***Commonwealth v. Edwards***, 256 A.3d 1130, 1137 (Pa. 2021) (footnote omitted). ***See id.*** at 1138 (concluding convictions of reckless endangerment and aggravated assault did not merge for sentencing because relevant subsection of "[a]ggravated assault . . . requires a person to cause serious bodily injury or an attempt to cause such bodily injury under circumstances manifesting extreme indifference to the value of human life[, while] REAP, by contrast, requires a person to place another

person in actual danger of death or serious bodily injury[;]" thus, "it is possible to commit one crime without committing the other.") (citations omitted).

In the present case, Appellant insists his convictions of attempted rape and indecent assault should have merged. As we explained **supra**, to convict Appellant of attempted rape, the Commonwealth was required to prove that Appellant, with the intent to engage in sexual intercourse with Victim by forcible compulsion, committed an act which constituted a substantial step toward the commission of that crime. **See** 18 Pa.C.S. §§ 901(a), 3121(a)(1). "A person is guilty of indecent assault if the person has indecent contact with the complainant, . . . and . . . does so by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution[.]" 18 Pa.C.S. § 3126(a)(3). "Indecent contact" is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S. § 3101.

We conclude Appellant's sentence is not illegal. Both the crimes of indecent assault and **attempted** rape each require proof of a statutory element the other does not. Indecent assault requires the "touching of the sexual or other intimate parts" of the victim's body. **See** 18 Pa.C.S. §§ 3101, 3126(a)(3). The crime of attempted rape does not require proof of any intimate touching. Rather, that offense requires proof of the defendant's **specific intent** to engage in sexual intercourse with the victim — while no such intent is required for the crime of indecent assault. Thus, his claim fails.

### VIII. <u>DISCRETIONARY ASPECTS OF SENTENCING</u>

In his final sentencing challenge, Appellant argues "the trial court imposed a manifestly excessive sentence" when it imposed the 40-to-84-month sentence for stalking to run consecutively to the mandatory minimum 25-to-50-year sentence for attempted rape. Appellant's Brief at 54. He maintains that because "no reasons for the sentence were placed on the record, [it] was not individualized and [the court] did not consider 42 Pa.C.S. § 9721(b)." *Id.* Specifically, Appellant argues the trial court did not consider his "history and characteristics" before imposing a *de facto* life sentence. *See* Appellant's Brief at 29, 55.

Appellant's claim is a challenge to the discretionary aspects of his sentence. It is well established that such a challenge does not entitle an appellant to "review as of right." *Commonwealth v. Caldwell*, 117 A.3d 763, 768 (Pa. Super. 2015) (*en banc*) (citation omitted). Rather,

> [b]efore this Court can address such a discretionary challenge, an appellant must comply with the following requirements:
>
> > An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Id.* (citation omitted).

- 40 -

Here, Appellant properly preserved his claim in a timely filed post-sentence motion before the trial court, and a timely appeal before this Court. In addition, his brief includes the requisite Pa.R.A.P. 2119(f) statement of reasons for allowance of appeal in his brief. *See* Appellant's Brief at 28-30. Accordingly, we must now consider whether Appellant's claim presents a substantial question justifying our review.

An appellant "presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." *Commonwealth v. Conte*, 198 A.3d 1169, 1174 (Pa. Super. 2018) (citation omitted).

> A court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question. Rather, the imposition of consecutive rather than concurrent sentences will present a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.
>
> > To make it clear, a defendant **may** raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question.

*Commonwealth v. Caldwell*, 117 A.3d 763, 769 (Pa. Super. 2015) (citations & quotation marks omitted). Moreover, we will not "accept bald assertions of sentencing errors." *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018).

- 41 -

Here, it is important to note that the trial court had no discretion with regard to the imposition of the 25-year mandatory minimum sentence for attempted rape, and three-year consecutive term of probation. *See* 42 Pa.C.S. §§ 9718.2(d) (court has no authority to impose lesser sentence when mandatory minimum is applicable); 9718.5(a) (requiring imposition of three-year consecutive probation when defendant conviction of Tier III sexual offense). Moreover, the trial court was informed by a pre-sentence investigation report. *See* N.T., 2/11/22, at 3. As our Supreme Court has explained:

> Where pre-sentence reports exist, we shall . . . presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself. [Moreover,] we state clearly that sentencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, . . . in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

*Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988).

Moreover, Appellant presents a bald claim that the trial court failed to consider his "history, background, or any of the [sentencing] factors as set forth in 42 Pa.C.S. § 9721(b)" before imposing the 40-to-84-month consecutive sentence for stalking. *See* Appellant's Brief at 29. He does not

specify what factors in particular the court ignored, or why his circumstances justified the imposition of a concurrent sentence. Moreover, as the Commonwealth points out, Appellant did not challenge the consecutive nature of this sentence in his Pa.R.A.P. 1925(b) statement. *See* Appellant's Statement of Errors Complained of on Appeal, 4/28/22, at 8-9. Thus, we conclude he had failed to raise a substantial question justifying our review.

Nevertheless, even if he had raised a substantial question, we would conclude no relief is warranted. Appellant's stalking conviction resulted from his unrelenting text messages and phone calls to Victim during the weeks leading up to the attempted rape — all while he was subject to a no-contact order based upon his prior convictions of terroristic threats made to Victim. Accordingly, there is no basis to conclude the trial court abused its discretion when it imposed a standard range, consecutive sentence for this offense. Thus, Appellant's final sentencing claim fails.

## IX.  **CONSTITUTIONALITY OF SORNA CHAPTER H**

Lastly, Appellant requests that we stay his sex offender registration requirements pending the Pennsylvania Supreme Court's decision in *Torsilieri*. *See* Appellant's Brief at 57.

By way of background, in July of 2018, "[t]he Chester County Court of Common Pleas declared Subchapter H of [SORNA[24]] unconstitutional as violative of several provisions of both the United States and Pennsylvania Constitutions." *Commonwealth v. Torsilieri*, 232 A.3d 567, 572, 574-75 (Pa. 2020). The Commonwealth appealed the decision to the Pennsylvania Supreme Court. *See id.* However, upon the record before it, the Court "was unable to conclude . . . whether [the defendant] ha[d] sufficiently undermined the validity of the legislative findings supporting Revised Subchapter H's registration and notification provisions[.]" *Id.* at 585. Therefore, the Supreme Court remanded the case to the trial court "to provide both parties an opportunity to develop arguments and present additional evidence and to allow the trial court to weigh that evidence in determining whether [the defendant] has refuted the relevant legislative findings supporting the challenged registration and notification provisions of Revised Subchapter H." *Id.* at 596.

Upon remand, the trial court conducted an evidentiary hearing in June of 2021, "at which [both] parties presented conflicting expert testimony." *See* 97 MAP 2022, Commonwealth's Statement of Jurisdiction, 9/19/22, at 4. Thereafter, on August 23, 2022, the trial court entered an order once again

---

[24] In the present case, Appellant was subject to the Subchapter H registration requirements. *See* 42 Pa.C.S. § 9799.11(c) (Subchapter H applies to "individuals who committed a sexually violent offense on or after December 20, 2012").

concluding that Revised Subchapter H of SORNA is unconstitutional, and granting the defendant's supplemental motion to bar application of SORNA. *See id.* at 1. The Commonwealth timely appealed to the Supreme Court, where the case is now pending.[25] *See id.*

Herein, Appellant requests that we stay his Subchapter H SORNA registration requirements because he raised the same constitutionality arguments in his post-sentence motion as the defendant in *Torsilieri*. *See* Appellant's Brief at 57 n.14. We decline to do so. Subchapter H has not been declared unconstitutional by the Pennsylvania Supreme Court, and "legislative enactments are presumed to be constitutional." *See Commonwealth v. Eid*, 249 A.3d 1030, 1041 (Pa. 2021). Moreover, Appellant will not be required to comply with the registration requirements until he is released from prison, which will not be for at least 25 years. Should the Supreme Court declare Subchapter H unconstitutional in the future, Appellant may seek relief at that time. *See Commonwealth v. Lacombe*, 234 A.3d 602, 617-18 (Pa. 2020) (SORNA claims need not be raised pursuant to Post Conviction Relief Act, and thus, not subject to Act's time constraints).

---

[25] The case is listed on the Supreme Court's May 2023 argument list. *See* 97 MAP 2022.

## X.    CONCLUSION

Upon our review, we conclude Appellant is entitled to no relief on any of the claims he has raised on appeal. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2023