J-S12034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
:
RYAN MARTIN :
:
Appellant : No. 2740 EDA 2023

Appeal from the Judgment of Sentence Entered July 10, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006667-2018

BEFORE: STABILE, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED JULY 10, 2025**

Ryan Martin ("Appellant") appeals from the judgment of sentence of

18½ to 37 years' incarceration imposed after a jury convicted him of multiple

sexual offenses against a minor. After careful consideration, we affirm.

The trial court set forth the factual history of this case as follows:

The testimony established that Appellant first met the
[c]omplainant's family in 2012, while participating in a program
of an organization founded by [c]omplainant's father and his
business colleagues to assist military veterans of the wars in
Afghanistan and Iraq. During his six months in the residential
program[,] Appellant became close to [c]omplainant's father, who
invited Appellant to live in his family's home. The household
consisted of [c]omplainant's father and mother, her brother, and
the infant [c]omplainant. Appellant moved out after a few
months, but continued to be close friends with the family,
generally, and with the young [c]omplainant in particular.

In June of 2018, … Appellant[,] who was then 39 years old, was
visiting at [c]omplainant's family's invitation to attend a dance
recital. On a Monday after the recital, [c]omplainant was in the
kitchen with her mother when she said she "had a secret with
[Appellant]," and that "it was about something hairy." The

[c]omplainant's mother asked if her daughter was talking about "[Appellant's] head or legs." The [c]omplainant then mentioned "[Appellant's] pee pee." The [c]omplainant then disclosed that … Appellant made her "kiss his pee pee" and "touch his butt."

The [c]omplainant's parents reached out to friends and family for support and advice, and also contacted the authorities (child protective services and law enforcement) to file a report. The Philadelphia Police Department Special Victim's Unit ("SVU") commenced an investigation.

As part of that investigation, there was a fifty[-]minute[,] video[-]recorded forensic interview of the [c]omplainant conducted by the Philadelphia Children's Alliance ("PCA"). During that interview, the five-year-old [c]omplainant said that Appellant had: exposed his penis and butt to her; touched her butt with his hand, over her clothes; made her touch his butt; used a ball-and-stick toy to rub on her vagina; touched the skin of her vagina with his hand; made her touch his penis with her hand; made her put her mouth on his penis; and made her sit on top of him with his penis touching between the skin of her butt-cheeks.[1] The [c]omplainant further stated that these events occurred more than one time when she had "secret time" with Appellant. During the interview, the [c]omplainant used many gestures and physical descriptions to recount all the things [Appellant] had done, including demonstrating body positioning and, at one point she stated that [Appellant] let her play with his front part[,] which he uses to pee[,] and that the part looks like a "squishy cap with a jiggly red line underneath."

At trial, five years later, the [c]omplainant testified about the details she could remember. She described a series of incidents that involved a game … Appellant called "choo choo train," where they both undressed and … Appellant then laid down on his back, sat the [c]omplainant on top of him, and penetrated her vagina with his penis. The [c]omplainant also testified about an incident where she sat on a bed while Appellant stood in front of her and put his penis in her mouth.

Trial Court Opinion ("TCO"), 6/26/24, at 2-3.

_____

[1] To be clear, complainant's accusations relate to incidents that occurred over a period of time, and were not limited to the weekend of the recital.

- 2 -

Following a multi-day jury trial, Appellant was convicted of rape of a child, involuntary deviate sexual intercourse with a child, unlawful contact with a minor, endangering the welfare of a child, corruption of minors, indecent assault, and indecent exposure.[2] On July 10, 2023, the trial court imposed an aggregate sentence of 18½ to 37 years of incarceration, followed by 3 years of reporting probation. That same day, the trial court granted trial counsel's request to withdraw from representation and appointed new counsel to represent Appellant for post-verdict proceedings and appeal.

On July 19, 2023, counsel filed a timely post-sentence motion on Appellant's behalf. The motion was denied on September 22, 2023. Appellant then privately retained new counsel, who entered her appearance on October 9, 2023, and filed a timely notice of appeal on October 20, 2023. The trial court and Appellant have each complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues for our review:

1. Did the trial court err in failing to permit a full and complete evidentiary hearing on the competency of the child complainant including on the issue of taint?

2. Did the trial court abuse its discretion and violate Appellant's constitutional right to present a defense when it (1) prohibited cross-examination regarding [the complainant's father's] state of mind and the [complainant's parents'] financial hardship at the time of the allegations and (2) precluded defense expert testimony critiquing the quality of the police investigation?

3. Did the trial court err in admitting the testimony of the Commonwealth's DNA expert when all parties agreed that

_____

[2] 18 Pa.C.S. §§ 3121(c), 3123(b), 6318(a)(1), 4304(a)(1), 6301(a)(1)(ii), 3126(a)(7), and 3127(a), respectively.

the underwear tested was not worn by the complainant at the time of the alleged offense, thus rendering this evidence irrelevant?

4. Did the trial court err in allowing a *voir dire* question which improperly sought to gauge perspective jurors' attitudes toward the potential evidence and their opinions about a specific principle of law?

Brief for Appellant at 2-3.

*Competency of the child witness*

Appellant's first claim suggests that the trial court erred in failing to conduct a full hearing on the issue of the complainant's competency to testify at trial. When a witness is under 14 years of age, the trial court will conduct an inquiry into the witness's mental competency before hearing their testimony. ***Commonwealth v. Gaerttner***, 484 A.2d 92, 98 (Pa. Super. 1984). When competency is challenged on appeal, "[o]ur standard of review recognizes that a child's competency to testify is a threshold legal issue that a trial court must decide, and an appellate court will not disturb its determination absent an abuse of discretion. Our scope of review is plenary." ***Commonwealth v. Page***, 59 A.3d 1118, 1126-27 (Pa. Super. 2013).

Although witnesses are generally presumed to be competent, the capacity of young children to testify, especially those under 14 years of age, is always a concern. ***Commonwealth v. Taylor***, 277 A.3d 577, 589 (Pa. Super. 2022). In these situations, trial courts must evaluate whether a child witness possesses the capacity to understand the questions being asked of them, and to frame and express intelligent answers; the mental ability to

observe the event, remember it, and talk about it in a realistic, not fantastic, manner; and a consciousness of the duty to speak the truth. *Id.*

Instantly, just before the Commonwealth called the then 10-year-old complainant to testify, the prosecutor asked if the court wished to conduct a competency hearing. N.T., 2/1/23 (afternoon), at 6. Upon hearing that the witness was 10 years old, the court agreed, stating, "Let's do a brief competency hearing." *Id.* The following exchange then occurred in open court, before the jury had been empaneled:

> [DEFENSE COUNSEL]: Judge, if I may, on the issue of the competency hearing, the child's been ruled competent twice, once about five years ago, once about four years ago, the [courts] have competent jurisdiction. I don't think it's necessary; but, most importantly, what I don't want to do is have competency questions going to the witness in front of the jury, bolstering somehow –
>
> THE COURT: It wouldn't be in front of the jury –
>
> [DEFENSE COUNSEL]: No, no, I understand, and what you're describing here I don't think is required and we aren't requiring it certainly. But the next issue is I've seen their competency colloquy twice in this case, so I don't want to see it a third time. ***Competency has already been ruled and we're stipulating to her competency.*** We don't need to bolster competency in front of the jury.
>
> THE COURT: It wouldn't happen in front of the jury either way.

*Id.* at 6-7 (emphasis added). This exchange is critical to our resolution of Appellant's first issue because his stipulation to the complainant's competency has waived the issue on appeal.

A stipulation is a declaration to a court that a certain fact is agreed upon by the parties; a valid stipulation must be enforced according to its terms. ***Commonwealth v. Perrin***, 291 A.3d 337, 345 (Pa. 2023). "Stipulations help

- 5 -

litigants and courts narrow the issues needing to be decided, encouraging judicial economy and conserving the limited resources of courts and litigants alike." *Id.* Our Supreme Court has stated that "parties may stipulate, and be bound by their acts as the law of the case, in all matters affecting them[.]" *Id.* Accordingly, Appellant certainly had the ability to stipulate to the complainant's competency.

In his brief, Appellant suggests that trial counsel was not really stipulating that the complainant was competent to testify; rather, he was "merely acknowledging the coordinate jurisdiction rule." Brief for Appellant at 20. This characterization is belied by the record. The words "coordinate jurisdiction" were never spoken by defense counsel. Moreover, had counsel wished to preserve future objections to the complainant's competency to testify, he could have said that he was stipulating to her competency "for purposes of this hearing" or used other limiting language. He did not do so. The stipulation had no limitations placed upon it.

Further, we stress here that this was not a stipulation about the witness's *credibility*, which would not be a proper subject for a stipulation. *Perrin*, 291 A.3d at 346 (holding that, because the factfinder had sole authority to determine witness credibility, any attempt by the parties to stipulate to the credibility of a witness improperly intruded upon the factfinder's prerogative and jurisdiction). Here, the stipulation involved the complainant's competency to testify, an issue which had previously been determined by multiple judges during the litigation of this case. The issue of

witness competency, as opposed to credibility, lies directly in the hands of the trial court. *Taylor*, 277 A.3d at 589 (""[C]ompetency is a threshold legal issue to be decided by the trial court. … [A] competency determination does not involve an assessment of credibility.""). Thus, a witness's competence to testify may be the subject of a stipulation that would bind the parties and the court.

A stipulation to a fact waives any claim of error regarding the admission of that fact into evidence. *See Commonwealth v. Lemanski*, 529 A.2d 1085, 1097 (Pa. Super. 1987) (stating that parties are bound to accept the facts to which they have stipulated). Further, issues relating to the competency of a witness may be waived. *Commonwealth v. Speicher,* 393 A.2d 904, 906 (Pa. Super. 1978) (""[C]ounsel's failure to object to the alleged incompetency of the eight[-]year-old victim constituted a waiver of the issue.""). Appellant's stipulation at trial to the complainant's competency to testify waives his claim on appeal that the court erred in failing to hold a third competency hearing prior to trial. Appellant is entitled to no relief on his first issue.

*Evidentiary Claims*

In Appellant's second issue, Appellant asserts that the trial court abused its discretion and violated his right to present a defense to the charges when it prohibited cross-examination of the complainant's father regarding both his state of mind at the time of the allegations and whether he was then experiencing financial hardship. Appellant also contends that the court erred

in precluding expert testimony proffered by the defense about proper police investigation techniques. We consider these arguments in turn.

In evaluating Appellant's claims, we first note that "[q]uestions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion." *Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020). An abuse of discretion is not established by demonstrating a mere error in judgment; rather, it is proven by the exercise of judgment that is manifestly unreasonable, a misapplication of law, or the result of bias, prejudice, ill-will or partiality. *Id.* Further, "an appellate court may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court." *Commonwealth v. DiStefano*, 265 A.3d 290, 298 (Pa. 2021).

The admissibility of evidence at trial is evaluated according to our Rules of Evidence.

> Pursuant to the Pennsylvania Rules of Evidence, "[a]ll relevant evidence is admissible[.]" Pa.R.E. 402. Evidence is deemed relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b).

*Commonwealth v. Faison*, 297 A.3d 810, 825 (Pa. Super. 2023), *appeal denied*, 320 A.3d 82 (Pa. 2024). A court may exclude relevant evidence from trial if it finds that the probative value of the evidence is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. Appellant asserts that the trial court's rulings prevented him from presenting a defense to the charges against him.

<u>Evidence of the complainant's family's finances and father's state of mind</u>

More specifically, Appellant avers that he should have been permitted to explore whether the complainant's family was in extreme financial distress at the time the complainant disclosed to her parents that Appellant had been sexually assaulting her. Specifically, Appellant argued that a significant tax lien had recently been put on the complainant's father's property, and his business was failing. Appellant suggests that the complainant's memories had been tainted by her father, who was losing his business, drinking heavily, acting erratically on the weekend of this incident and knew that Appellant had significant financial means. Appellant argues that the father had visited a civil attorney seeking to sue Appellant for money damages after this incident. Thus, Appellant maintains that evidence of the family's financial difficulties provided the primary motive for the complainant's father to coach the child complainant into making these allegations. Brief for Appellant at 27-31.

This claim arose from the Commonwealth's motion *in limine*. While the Commonwealth agreed that cross examination on the complainant's family finances would be proper, it argued that extrinsic evidence in the form of financial documents would be improper. The motion was addressed by the trial court in a hearing prior to trial. The trial court explained:

There was not an actual motion by the defense regarding the [family's] financial documents. The court ruled that Appellant could examine witnesses on these issues for purposes of showing motive and bias, which the Commonwealth did not dispute, but that Appellant could not introduce documents relating to financial condition. As the court explained [while ruling on the issue]:

So I think using documents for something like that is way too deep. I see it as collateral and creating a potential of confusing the issues in the case. The financial motive will be clear from cross-examination on the fact of them seeking or retaining counsel for civil litigation.

TCO at 7 (quoting N.T., 1/31/23, at 18). It further elaborated:

Here, going down the rabbit-hole of documentary evidence regarding financial resources risked the exact confusion of the issues and misleading of the jury that the [r]ule authorizes a court to exclude. Whatever small additional probative value the evidence may have had, if any, was outweighed by the risk of confusion and the jury being misled.

*Id.* We agree with this analysis.

As stated previously, Rule 403 permits the exclusion of evidence if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. *Commonwealth v. Kane*, 188 A.3d 1217, 1228 (Pa. Super. 2018). Further, unfair prejudice has been defined as "a tendency to suggest [a] decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* (citation omitted). Rule 403 vests a trial court with the authority to determine the admissibility of the evidence with an eye towards "clear, concise, and expeditious presentation, allowing for the exclusion of evidence that is confusing, cumulative, or unfairly prejudicial." *Commonwealth v. Dewald*,

317 A.3d 1020, 1041 (Pa. Super. 2024), *appeal denied*, 333 A.3d 647 (Pa. 2025).

After review, we conclude the trial court did not abuse its discretion in this matter. First, extrinsic evidence purporting to show that the complainant's family was experiencing financial difficulties, as proof that the family had a possible motive to pursue baseless charges against Appellant, would have had limited probative value, as it would have inserted wholly tangential questions to the ultimate issue in the case of whether Appellant engaged in sexual acts with the complainant. There was never any evidence presented to suggest that father somehow initiated the complainant's allegations.

Second, the jury received testimony about father's knowledge of Appellant's apparent financial successes, and that the nonprofit organization that father had been running, and through which he met Appellant, was no longer in operation. N.T., 2/3/23 (morning), at 31-32, 44-45, 54, 61. The jury also heard that the complainant's father told both Childline and law enforcement during the initial reporting of the allegations that Appellant was wealthy; father claimed he wanted to let authorities know that Appellant could easily flee the jurisdiction. *Id.* at 44-45, 57.

Yet, when the complainant's father was asked if he had filed a lawsuit against Appellant, he answered that he had not, although he admitted to speaking with an attorney about five months after the recital. *Id.* at 26, 53-55. The complainant's mother agreed that, although they spoke with an

- 11 -

attorney, they had not yet filed a civil lawsuit against Appellant related to the allegations. N.T., 2/3/23 (afternoon), at 27. The jury also learned that the civil law firm sent a letter to Appellant suggesting that a suit for money damages was imminent, but the complainant's mother and father both testified that the firm's sending this letter to Appellant was done without their knowledge or consent. N.T., 2/3/23 (morning), at 55-57; N.T., 2/3/23 (afternoon), at 28-34, 56-57. Since there was no pending lawsuit, additional testimony of this nature would have been improper. *Cf. Commonwealth v. Butler*, 601 A.2d 268, 271 (Pa. 1991) (holding the trial court erred in refusing to allow the defendant to cross-examine a Commonwealth witness regarding the civil suit *then pending* between the defendant and the witness).

Defense counsel also cross-examined both of complainant's parents about whether father drank alcohol to excess on the weekend of the recital and whether he exhibited manic behavior. N.T., 2/3/23 (morning), at 82; N.T., 2/3/23 (afternoon), at 50-53 (questioning mother about father's drinking and behavior that weekend). A family friend who had been present for most of the time in question was also asked about father's aberrant behavior that weekend and whether he had been drinking alcohol excessively. N.T., 2/2/23 (afternoon), at 74-75.

Considering all of this evidence, the trial court addressed Appellant's claim as follows:

> The financial motives and biases of the [c]omplainant's parents were adequately explored. Examination of the [p]arents about

their finances would have added little to Appellant's theory, while creating a substantial risk of confusion for the jury.

TCO at 8.

We agree. Certainly, the ultimate issue in this case was whether Appellant engaged in sexual acts with the young child; any evidence about financial stresses faced by the family would have had limited applicability to that issue. Moreover, Appellant was not precluded from arguing his theory that father had a strong interest in obtaining a monetary settlement from Appellant, and Appellant was able to elicit ample information supporting this claim during cross-examination, as well as argue the issue to the jury at closing. N.T., 2/8/23, at 33-34 (closing argument). The trial court did not abuse its discretion by limiting the testimony further, or by precluding the admission of documentary evidence regarding the family's finances, in order to avoid confusing the jury or to prevent the jury from focusing on an ancillary matter. Pa.R.E. 403; **Kane**, **supra**.

<u>Evidence regarding the police investigation</u>

Appellant also argues that the trial court erred in limiting or preventing him from presenting testimony from defense experts regarding the quality of the police investigation. To this claim, we note that Appellant offered the testimony of Dr. Viola Vaughan-Eden, Ph.D., a professor at Norfolk State University, "as an expert in the standards and procedures of multidisciplinary teams and the investigation of allegations of child sex abuse." N.T., 2/6/23 (afternoon), at 41.

When reviewing challenges to the admission of expert testimony, we note that such decisions are generally left to the discretion of the trial court, and its rulings thereon should not be reversed absent an abuse of that discretion. *Commonwealth v. Cramer*, 195 A.3d 594, 605 (Pa. Super. 2018). Moreover, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *U.S. v. Sheffer*, 523 U.S. 303, 308 (1998). Expert testimony is permissible in criminal trials as follows:

**(b) Qualifications and use of experts.--**

(1) In a criminal proceeding subject to this section, a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence or domestic violence, that will assist the trier of fact in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted.

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

42 Pa.C.S. § 5920(b).

Expert testimony is appropriate when offered by a witness that has a "reasonable pretension to special knowledge on the subject under investigation." *Commonwealth v. McCloskey*, 835 A.2d 801, 810 (Pa.

- 14 -

Super. 2003). Here, Dr. Vaughan-Eden was a licensed clinical social worker and child and family therapist, as well as a professor of social work. N.T., 2/6/23 (afternoon), at 33-36. She had evaluated approximately 2,000 cases related to child abuse and neglect. *Id.* at 40. Dr. Vaughn-Eden had qualified as an expert in multiple jurisdictions regarding allegations of child sexual abuse. *Id.* at 41. She was qualified "in the standards and procedures followed by multidisciplinary teams in the investigation of allegations of child abuse." *Id.* Dr. Vaughan-Eden explained that "the role of the multidisciplinary team is to essentially investigate and provide recommendations for intervention and treatment." *Id.* at 45. She said that the forensic interviewer, prosecutor, law enforcement, and medical personnel collaborate on the case; the purpose of such collaboration is to "lend a certain amount of objectivity and neutrality to the investigation around supporting or refuting the allegation." *Id.*

Here, after reviewing the forensic interview of the complainant, Dr. Vaughan-Eden stated that certain procedures and protocols associated with child abuse cases "were not consistently followed." *Id.* at 46. The court sustained the Commonwealth's objection to a question about what the multidisciplinary team's role should be after the forensic interview is complete in the criminal investigation. *Id.* at 49. Additionally, objections to questions asking about whether the team found corroborating evidence for the complainant's allegations were sustained. *Id.* at 58.

Yet, Dr. Vaughan-Eden was still able to testify as to certain deficiencies in the investigation of this case. Dr. Vaughan-Eden testified as to errors in

the forensic interview process. *Id.* at 46-49. She explained that the forensic interviewer did not follow through with certain important questions, and that, at times, the interviewer used different words than those used by the complainant during some questioning (for example, interchanging the word "on" for the word "in"), and the interviewer also failed to determine the source of the complainant's statements when the complainant used words that should have been unfamiliar to the then five-year-old, like "supervising." *Id.* at 47-48. She further testified that photos of the home were not taken at the time the abuse was reported, and evidence like a big red fluffy chair as described by the complainant was not preserved. *Id.* at 52. Further, the witness explained that certain investigatory guidelines specifically recommended that evidence should be collected to corroborate the child's statements. *Id.* at 53. She also agreed that "things" were "problematic" with respect to a social worker's investigation into complainant's home. *Id.* at 53-54. Dr. Vaughan-Eden did state that one purpose of the multidisciplinary team is to "collect as much information [and] supporting evidence that you can to back up the child's story." *Id.* at 59. In response, defense counsel asked, "To give a reliability to it [the child's story]?" *Id.* The trial court then interjected, "No, no, no[,]" and further explained that the witness needed to "stay[] away from any conclusions that are only for the jury to make as far as the credibility of any of the witnesses or the child or whether something actually happened." *Id.* at 60.

After review, we conclude that the court did not err in this regard. While questions relating to proper evidence collection in multidisciplinary teams investigating allegations of child abuse were proper, any question that invaded the jury's province would be properly limited. Dr. Vaughan-Eden was properly precluded from discussing the credibility of the complainant, as such testimony is inadmissible by our rules of evidence. Pa.R.E. 403. She further was limited in discussing whether "all the potential evidence" was collected, but permitted to opine whether it would have been helpful to have police collect certain items, like the red fluffy chair, to aid the investigation. N.T., 2/6/23 (afternoon), at 58-59. Thus, the trial court limited the expert from giving an opinion about the weight of the evidence presented against Appellant. "Determining the weight and credibility of witness testimony … has long been held to be the part of every case that belongs to the jury[.]" **U.S. v. Sheffer**, 523 U.S. 303, 313 (1998). Limiting the expert's testimony by sustaining the objections in this instance was not an abuse of discretion.

Moreover, even if we were to conclude that an error occurred, it would be harmless.

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

**Commonwealth v. Hamlett**, 234 A.3d 486, 491 (Pa. 2020). An error in excluding evidence is harmless if the evidence is cumulative of other properly

admitted evidence at trial and does not prejudice the defendant's right to a fair trial. ***Commonwealth v. Fell***, 309 A.2d 417 (Pa. 1973). In the case at bar, the jury heard evidence from multiple sources, including Dr. Vaughan-Eden herself, about the various deficiencies exhibited by law enforcement in the investigation of this case. ***See, e.g.***, N.T., 2/2/23 (morning), at 5-44 (testimony of Sergeant David Ferreira); N.T., 2/2/23 (afternoon), at 29-52, (testimony of forensic interviewer Michelle Kline); N.T., 2/6/23 (morning), at 71-77, 83-84 (testimony of Detective Ronald Kahlan). Thus, we conclude that the limitations placed on Dr. Vaughan-Eden's testimony did not contribute to the guilty verdict here, as the information Appellant wished this witness to convey to the jury about deficiencies in the investigation was presented via other witnesses, and extensively argued to the jury, such that the exclusion could not have contributed to the guilty verdict. Thus, if any error occurred in limiting her testimony at trial, it was harmless. Appellant is not entitled to relief on this basis.

<u>Precluding the testimony of Dr. Darrin Porcher</u>

Appellant further claims that the trial court erred in precluding the testimony of another expert witness, Dr. Darrin Porcher. A 20-year veteran of the New York Police Department, Dr. Porcher was offered as an expert in police practices in investigating allegations of child sexual abuse. Defense counsel had retained Dr. Porcher prior to trial, and he reviewed the discovery in this case, including medical and school records of the complainant, as well as notes of testimony from Appellant's preliminary hearing and motions

hearings. Dr. Porcher's report recounts the Commonwealth's evidence, suggests that it is not credible, and called Appellant's arrest in this case a miscarriage of justice. Prior to trial, the Commonwealth filed a motion *in limine* to preclude his testimony. Appellant maintains that the Commonwealth's motion was improperly granted in that preventing this witness from testifying denied Appellant the opportunity to present his defense to the charges.

Preliminarily, we note that "[e]xpert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman." ***Commonwealth v. Jones***, 240 A.3d 881, 890 (Pa. 2020). The standard for qualifying as an expert is a liberal one, and it is up to the finder of fact to determine what weight an expert's testimony should be afforded. ***Id.*** Nonetheless, "expert testimony may not be used to bolster the credibility of witnesses because witness credibility is solely within the province of the jury." ***Commonwealth v. Pitts***, 740 A.2d 726, 733 (Pa. Super. 1999).

According to defense counsel, Dr. Porcher was retained to write a report and asked to testify as to how a proper investigation in a child sex abuse case should take place. N.T., 1/31/23, at 52-53. This report discussed certain discrete failings in the investigation of this crime, including that police failed to document the condition of the complainant's home when the allegations were first made and failed to corroborate the complainant's statements.

The trial court explained why it granted the Commonwealth's motion and precluded the testimony of Dr. Porcher at the time it rendered its decision, as follows:

> It is clear from the content and [tenor of] the report that it is a piece of advocacy [designed] to make assertions about evidence and a credibility determination. That is for the jury to make, only. And what little, maybe few, [points of] evidence to educate the jury on matters that they are not familiar with [about] the police investigation, or what it should look like in Pennsylvania or Philadelphia is minimal at best or probably missing all together.
>
> ***It is clear for this [c]ourt that this witness is not – it had not been demonstrated that this witness [has been] called to educate someone in an area but[, rather,] to suggest, dictate, and justify opinions on credibility for all of the witnesses to be called in this case.***
>
> So having considered that report, as well as the arguments of both counsel – and I will mark this report as D-1 for purposes of this motion; it will be part of the record. That motion is granted.

N.T., 2/1/23 (morning), at 4-5 (emphasis added). Following the court's ruling, defense counsel asked whether the expert's report could be rewritten in such a way that credibility was not discussed, such that the expert's testimony could become admissible. ***Id.*** at 6. Further explaining why the report was not admissible, and why, in its view, rewriting the report would not be possible, the court stated: "It was really – it was a summation argument; a lawyer might as well have written it. … I couldn't find a single paragraph that was useful as expert evidence because that was the full content and tenor, seemingly the full purpose of it." ***Id.***

After reviewing the expert report, we agree with both the trial court's assessment of it and its decision to preclude Dr. Porcher from testifying in this

case. The 20-page report, included in the reproduced record at RR 0569-0588, begins with seven full pages, single-spaced, detailing the statements made by the complainant and her parents. Report of Dr. Darrin Porcher, 2/10/20, at 3-10; RR at 0571-0578.[3] The report claims that Dr. Porcher had found "a shocking deviation from accepted police practices[,]" *id.* at 10, RR at 0578, and it includes headings relating to, "Failure to Interview [complainant] at Alleged Crime Scene," "Failure to Search for Evidence," and "Failure to Confirm or Refute Description of Genitalia." *Id.* at 10-13; RR at 0579-0581. A large portion of the report, devoted to, "Evidence of Taint or Coaching," consists of arguments based upon the statements made by the complainant. *Id.* at 13-16; RR at 0581-0584. Finally, the report ends with a long section entitled, "Lack of Probable Cause," and one entitled, "MDT Failed to Collaborate and Corroborate." *Id.* at 16-19; RR at 0584-0587.

We agree with the trial court's portrayal of this document as akin to an advocate's brief. In each sub-section, Dr. Porcher merely reiterates the testimony from prior hearings, and then argues how this information should be interpreted to provide a not-guilty verdict. Attacks on the credibility of the complainant and her family are interspersed throughout this report. The

---

[3] Dr. Porcher's report is not included in the certified record. However, it is included in the reproduced record and neither party disputes its accuracy. *Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (*en banc*) ("[O]ur Supreme Court indicated that, in certain circumstances, we may consider an item included in the reproduced record that has been omitted from the certified record. Specifically, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it.") (citation omitted).

actual investigation undertaken by police, and what should have been done differently, is recounted only in passing; the primary focus is on whether the witnesses' statements were credible and whether probable cause had been established. Credibility determinations and the proper weight to be given to the presented evidence are within the jury's purview, and are not proper subjects of expert testimony. *Pitts*, *supra*.

Moreover, Appellant repeatedly argued throughout this trial that the police investigation should have been more fulsome, that witnesses should not have been believed, and that police rushed to judgment. Thus, he was able to present his arguments to the jury, and was not precluded from advancing his defense. *See Commonwealth v. Rivera*, 108 A.3d 779, 795 (Pa. 2014) (stating that expert testimony on police procedures is unnecessary where counsel's cross-examination conveyed the same information). Rather, the trial court correctly acted as a gatekeeper by keeping improper testimony from the jury which would have usurped the jury's fact-finding mission. There was no error in failing to permit Dr. Porcher to testify.

*Error in admitting the Commonwealth's DNA expert testimony*

Appellant's third issue claims that the trial court erred in failing to preclude testimony from the Commonwealth's DNA expert, as it was irrelevant confusing, misleading, and unduly prejudicial. The testimony surrounds a sample of DNA obtained from the outside of the complainant's underwear, which tested positive for the presence of male DNA but did not identify Appellant, as the results therefrom were deemed "inconclusive." Appellant

maintained that the evidence should not have been admitted at his trial because the underwear was not worn by the complainant at the time of the last alleged offense; she had changed into this underwear after the incident happened but before going to the hospital. Thus, it appears that Appellant is alleging that the evidence should have been precluded under Pa.R.E. 403. Brief for Appellant at 39 (arguing that the DNA analyst's testimony should have been excluded because its probative value was outweighed by a danger of unfair prejudice).

More specifically, Appellant challenges the testimony of Ms. Jean Hess, a forensic scientist in the DNA lab. N.T., 2/6/23 (morning), at 88. Ms. Hess explained to the jury how DNA testing is done, *id.* at 93-98, and testified about the test results obtained in this case. *Id.* at 98. In particular, Ms. Hess stated that she had analyzed the sample in this case, but "no profiles were produced because they all stopped at quantification." *Id.* Ms. Hess further testified that another analyst (no longer with the agency) had performed additional DNA testing and found a small sample of DNA on the complainant's underwear which was ultimately compared to Appellant's DNA. *Id.* at 100-01. Results of that comparison were "inconclusive" due to insufficient data. *Id.* at 101. The witness further explained that an inconclusive result could occur if there were too many DNA profiles contained in a mixture such that one potential contributor could not be identified, or, alternatively, it could be the result of the tester's not having enough DNA in the sample to identify a source. *Id.* at 101-02.

During cross-examination, defense counsel reiterated that the testing in this case ***did not find*** Appellant's DNA was on the complainant's underwear, or anywhere on the child. ***Id.*** at 105. Ms. Hess confirmed that no male DNA evidence was found on the complainant's body. ***Id.*** at 106-07. Rather, there was one sample recovered from the outside of the waistband of the complainant's underwear that was a mixture of partial DNA profiles from the complainant and at least one unidentified male. ***Id.*** at 108. Further, defense counsel brought out the fact that the male sample was never tested or compared to DNA from father, the complainant's brother, or her uncle. ***Id.*** at 109.

> In addressing this issue, the trial court stated:
>
> The purpose of this testimony was to explain the testing and to show that Appellant was not excluded as the source of DNA found on the underwear [c]omplainant changed into after the alleged incident. In this regard, it was probative. Moreover, the testimony was not unduly prejudicial or confusing to the jury. To the contrary, the testimony was necessary to explain to the jury the testing that was done on DNA evidence and the meaning of the results of that testing. Without Ms. Hess's testimony, the jury would have been left to speculate as to the results.

TCO at 16. We agree with this assessment. We further note that this testimony was not a large part of Appellant's trial; Ms. Hess's entire testimony, including that regarding her expert qualifications, constitutes just 25 pages of testimony in a trial that spanned several volumes of testimony and lasted almost two weeks. Ms. Hess's testimony was not emphasized or sensationalized to the jury. Moreover, the testimony was limited to the

specific information relevant to the jury and explained the Commonwealth's prosecution of the case.

We further note that not only did Appellant cross-examine Ms. Hess about the lack of reference samples for comparison purposes from the complainant's male family members, but Appellant was also able to present his own forensic DNA analyst/expert at trial, on the same afternoon that Ms. Hess testified, who reviewed and critiqued the Commonwealth's DNA testing procedures. **See** N.T., 2/6/23 (morning), at 109; N.T. Jury Trial, 2/6/23 (afternoon), at 73-91 (Testimony of Christian G. Westring, Ph.D.). In fact, both Ms. Hess and Dr. Westring testified that Appellant's DNA was **not** found on the complainant's body or clothing. N.T., 2/6/23 (morning), at 105; N.T., 2/66/23 (afternoon), at 79. Because Ms. Hess's testimony was relevant to the Commonwealth's story of the case in explaining how they conducted their investigation, and because the testimony was limited, we find no abuse of the court's discretion in admitting this testimony.

*Voir dire question*

As the final issue on appeal, Appellant suggests that the court erred by asking the following question to prospective jurors on *voir dire*:

> The law in Pennsylvania states that the testimony of a complaining witness standing alone if believed by you beyond a reasonable doubt can be sufficient proof upon which to find a defendant guilty in this type of case. If you are selected as a juror, would you be able to follow that point of law?

N.T., 1/30/23, (morning), at 41.[4]  We note that this question was not asked of the jury panel as a whole, it was only asked of those potential jurors who engaged in individual *voir dire*, directly answering questions from the judge. Defense counsel preserved the issue by objecting to the question the first time it was asked.  ***Id.*** at 43-47.

Preliminarily, we note that the scope of *voir dire* is a matter "within the sound discretion of the trial court, and we will not reverse the court's decisions on *voir dire* absent a palpable abuse of discretion."  ***Commonwealth v. Walker***, 305 A.3d 12, 16 (Pa. Super. 2023), *appeal granted*, 316 A.3d 622 (Pa. 2024).  The only purpose of *voir dire* is to empanel a competent, fair, impartial, and unprejudiced jury capable of following the instructions given to them by the trial court.  ***Id.***  Moreover, in reviewing this issue, our courts have explained that,

> [n]either party is permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of a case.  *Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies.
>
> Additionally, a court will not be found to abuse its discretion during *voir dire* examination by refusing to permit questions whose subject matter falls within the province of the trial court to address in its instructions to the jury.  Questions however that seek a prospective juror's opinion about a principle of law are not permissible under *voir dire* examination.

---

[4] We cite to only the first incidence of this question being asked to jurors, as all repeated questions used identical terminology.

*Id.* at 16-17 (citations omitted). Because the purpose of *voir dire* is to provide counsel with an opportunity to assess the qualifications of the prospective jurors, it is appropriate to use *voir dire* to disclose a potential juror's fixed opinions or to expose other reasons for disqualification. **Commonwealth v. Ellison**, 902 A.2d 419, 423 (Pa. 2006). Nonetheless, *voir dire* should not be used to ask direct or hypothetical questions which are designed to disclose the juror's opinion or attitude about what their decision may be under a particular set of facts which might arise during trial. **Commonwealth v. Knight**, 241 A.3d 620, 640 (Pa. 2020).

> Pennsylvania law explicitly states:
>
> The credibility of a complainant of an offense under this chapter shall be determined by the same standard as is the credibility of a complainant of any other crime. The testimony of a complainant need not be corroborated in prosecutions under this chapter. No instructions shall be given cautioning the jury to view the complainant's testimony in any other way than that in which all complainants' testimony is viewed.

18 Pa.C.S. § 3106.

Appellant here asserts that by asking the *voir dire* question at issue, the Commonwealth was attempting to gauge the juror's reaction to the trial evidence prior to presenting any testimony or argument. Specifically, Appellant argues that "because the question was in the nature of a jury instruction and concerned a legal principle, i[t] contained impermissible subject matter for *voir dire*." Brief for Appellant at 41. Appellant further contends:

Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of a case. …

This *voir dire* question allowed the prosecution to get a preview of how prospective jurors would react to a sexual assault case, like Appellant's case, in which there [was] little or no corroborating evidence of the complainant's allegations.

*Id.* at 42-43 (citation and quotation marks omitted).

Appellant properly notes that our Supreme Court is currently evaluating an almost identical question proposed to jurors during *voir dire*. **See Walker**, **supra**. Arguments on the issue occurred before our Supreme Court in November 2024, and no decision has been rendered as of the date of this memorandum. While Appellant suggests that we hold any decision in this appeal until the **Walker** decision is published, we decline the invitation to do so. Until a contrary decision is rendered by the Pennsylvania Supreme Court, this Court remains bound by decisions of the Superior Court on this issue. **See Marks v. Nationwide Ins. Co.**, 762 A.2d 1098, 1101 (Pa. Super. 2000) (holding that an intermediate appellate decision remains precedential, despite the intervening grant of a petition for allowance of appeal as to that decision, unless or until the Supreme Court overturns it).

In **Walker**, this Court explained why the *voir dire* question was not improper:

The Commonwealth had a proper purpose for asking the *voir dire* question. Its purpose was to identify jurors who hold fixed beliefs that are untenable under Section 3106—specifically, the belief that a defendant's guilt cannot be established beyond a reasonable doubt in a rape case (1) without DNA or other forensic

- 28 -

evidence or (2) when the case boils down to the word of the complainant versus the word of the defendant (a so-called "he said, she said" case). Any prospective juror holding either of these fixed beliefs had to be questioned further and had to be excused for cause if he could not set aside those beliefs. ***See Commonwealth v. Kelly***, 134 A.3d 59, 60 (Pa. Super. 2016) (it is appropriate to use *voir dire* examination to disclose fixed opinions or expose other reasons for disqualification of prospective jurors).

***Walker***, 305 A.3d at 17. We further explained:

Turning to the circumstances at hand, the Commonwealth's case was based almost entirely on the victim's testimony. Pursuant to this state of affairs, we cannot conclude the court abused its discretion when it permitted a question designed to expose any fixed opinions of the jurors regarding the lack of physical or corroborating evidence. As such, the question was used to "secure a competent, fair, impartial and unprejudiced jury" and was not used to ascertain the effectiveness of a potential trial strategy. ***See*** [***Commonwealth v.***] ***Ellison***, 902 A.2d [419,] 423-24 [(Pa. 2006)].

***Id.*** at 18.

Like in the ***Walker*** case, Appellant was faced here with the evidence against him consisting almost exclusively of the complainant's testimony, with no corroborating physical evidence. There were no witnesses to any assaults. The *voir dire* question at hand is a correct statement of the law, and it was appropriate to consider whether the prospective jurors in this case possessed fixed opinions in conflict with that law. The Commonwealth had a legitimate interest in ascertaining whether jurors could follow that law. ***Walker***, ***supra***. Accordingly, the *voir dire* in this case did not run afoul of current legal standards. Appellant is not entitled to relief on this issue.

Finding no merit to Appellant's claims, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/10/2025